**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **FLORA F. FRENCH,** | : |
| **Plaintiff,** | : |
| | : 5:04-cv-389 (CAR) |
| v. | : |
| **J. BARRY SELLERS, an individual,** | : |
| **CROCKETT R. SELLERS, an individual,** | : |
| and **SELLERS MANAGEMENT** | : |
| **SERVICES, LLC,** | : |
| **Defendants.** | : |

*ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

Plaintiff Flora French ("French") brings this action against Defendants J. Barry Sellers, Crockett R. Sellers (Barry Sellers's wife), and Sellers Management Services, LLC. Through this action, French alleges that Defendant Barry Sellers made certain misrepresentations and omissions in connection with Crockett Sellers's purchase of French's interest in Wilkinson Kaolin Associates, LLLP ("WKA"), a Georgia Limited Liability Limited Partnership managed by Defendant Sellers Management Services, LLC. In her complaint, French asserts: (1) violations of Rule 10b-5 of the Securities Exchange Act; (2) breach of fiduciary duty; (3) fraud; (4) unjust enrichment; (5) conspiracy; and (6) punitive damages.[1] Before the Court is Defendants' Motion for Summary Judgment [Doc. 34]. For the reasons discussed below,

---

[1] French's complaint also alleges a violation of the Georgia Securities Act, but in her Response brief, she withdraws this claim. (Pl's Resp. Br. 2 n.1).

1

Defendants' motion is **GRANTED in part and DENIED in part**. Specifically, Defendants' motion is **GRANTED** with respect to French's unjust enrichment claim, but **DENIED** with respect to her remaining claims.

## BACKGROUND

Wilkinson Kaolin Associates, LLLP ("WKA") was a Georgia Limited Liability Limited Partnership formed in 1982 to mine and process kaolin clay. Defendant Barry Sellers was its General Partner and majority interest-holder. The partnership interests not owned by Barry Sellers were divided into 100 limited partnership units, which were then sold to various investors.

French purchased a one-unit interest in WKA at the time of its formation in 1982 for the price of $32,500. Over the years, French and other partners periodically received dividends from the partnership, the majority of which ranged between $1,000 and $2,500. French and other partners also received information from Barry Sellers about WKA's operations, including financial statements, tax forms, and management update letters. Arguably, Sellers's communications painted a decidedly mixed picture of WKA's past financial performance and future prognosis. (Pl's Resp. Br. 4).

As a result of WKA's meager dividends and uncertain prospects, French grew dissatisfied with her investment. Accordingly, on November 7, 2002, she asked her husband, Dr. Ronald French, to call Barry Sellers to ask about selling her interest in the company. Though the substance of Ronald French's conversation with Barry Sellers is disputed, on summary judgment, the Court must accept French's version of the facts as true, and so that version is the one recounted here. Ronald French claims he asked Sellers whether his wife's interest could be

sold for its cash value.  Barry Sellers responded that he did not know whether there was any market for the limited partnership unit, but promised that he would look into the matter and report back to the Frenches.  According to Ronald French, Barry Sellers did not mention that he planned to expand the company's production in the following year by building a third kaolin mill, that he was trying to sell the company, that he had retained an independent investment banking firm to assist him with the sale, or that he had received indications of interest from various prospective buyers offering between $10 and $14 million.

Instead, by letter dated November 7, 2002—the same day he spoke with Ronald French—Barry Sellers forwarded an "Assignment of Limited Partnership Unit" ("Assignment") to French.  The Assignment listed Defendant Crockett R. Sellers, Barry Sellers's wife, as the "Assignee" and indicated that Crockett Sellers would pay $15,000 for French's interest.  The Assignment further stated:

> It is understood that the consideration which has been paid by the Assignee for the Limited Liability Limited Partnership Unit hereby assigned by the Assignor represents an arbitrary arms-length value as determined between a willing and ready buyer and a willing and ready seller.  *Assignor understands the General Partner **has recently engaged an investment banker to examine the feasibility of partnership sale, expansion, or acquisition** and both parties agree that the purchase price for the Unit hereby sold by Assignor neither reflects or is indicative of any past, present or future fair market value for the Limited Liability Limited Partnership Unit.  This unit may in the future become more valuable and Assignor accepts the present consideration paid as in full and complete payment for said Limited Liability Limited Partnership Unit hereby assigned.*

(Assignment ¶ 6) (emphasis added).  After merely scanning the document, French executed the Assignment and returned it to Barry Sellers.  On November 14, 2002, Barry Sellers forwarded French a check for $15,000 drawn on his wife's account.

Meanwhile, unknown to French, as early as 2001, Barry Sellers had begun exploring the

3

possibility of expanding or selling WKA. In the fall of 2001, he retained EquiCo, a California-based investment banking firm that specializes in representing sellers of privately-held middle market businesses. EquiCo began by performing a valuation of WKA. In conducting this valuation, EquiCo received extensive financial information about WKA from Barry Sellers and WKA's accountants. From the outset of the valuation, Barry Sellers indicated to EquiCo that he believed WKA could be sold for at least $20 million—a price that arguably would translate to approximately $150,000 per partnership unit. (Pl's Resp. Br. 27). EquiCo completed the valuation in April 2002, and concluded that WKA could be expected to command a price of $5.5 to $7.5 million if it were sold. Barry Sellers, however, objected to the valuation on the grounds that it was too low. Nevertheless, Barry Sellers agreed to move forward with the sale.

In May 2002, EquiCo began marketing the sale of WKA. It prepared a list of prospective buyers and sent those buyers a one-page précis. It then sent a Confidential Information Memorandum detailing WKA and its business to those buyers who, after reviewing the précis, expressed an interest in the company, and agreed to execute a confidentiality agreement. At least twelve potential buyers executed confidentiality agreements and received the Confidential Information Memorandum. For at least three, possibly five, of those twelve, Equico and Sellers conducted in-person "management presentations" and "buyer visits." (EquiCo / Burke Dep. 126:15-128:5).

By the time French contacted Barry Sellers about selling her interest, he had received letters from at least two potential buyers indicating their interest in acquiring WKA. The letters further specified the amounts the buyers would be willing to pay. The first letter, dated August 26, 2002, contained an offer from Zemex Corporation to purchase WKA for $10.5 million. The

second letter, dated August 30, 2002, included an offer from Unimin Corporation to purchase the business for between $10 million and $14 million. Both offers remained on the table throughout the period that French was negotiating the sale of her unit with Sellers. Unimin did not withdraw from the process until November 26, 2002, and Zemex remained interested until December 20, 2002. In fact, exactly one week before Ronald French contacted Barry Sellers, representatives of Zemex traveled to the WKA plant to tour its facilities.

Ultimately, Barry Sellers sold WKA to American Borate Company for $27,150,000. The sale closed on December 3, 2003. The sale price resulted in a net cash value of approximately $180,000 per limited partnership unit.

After learning of the sale, French filed the present action in this Court. French alleges that she never would have sold her interest in WKA had she received full and accurate disclosure of the true market value of her interest and the business and financial affairs of WKA from Barry Sellers. In his defense, Barry Sellers denies ever asserting to French that the $15,000 his wife, Crockett Sellers, paid for her interest represented its fair market value. Barry Sellers further maintains that he disclosed both the fact that French's interest was potentially worth more than $15,000, and the fact that WKA was exploring the possibility of a sale, in the Assignment. Specifically, the Assignment advised that the $15,000 price "neither reflect[ed] [n]or [wa]s indicative of any past, present or future fair market value" of French's interest. It also stated that Barry Sellers had "recently engaged an investment banker to examine the feasibility of partnership sale, expansion, or acquisition." (Assignment ¶ 6). On summary judgment, Barry Sellers argues that these disclosures were sufficient to satisfy his obligations under federal securities and Georgia law.

5

## *SUMMARY JUDGMENT STANDARD*

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and make all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not

entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## *DISCUSSION*

In her complaint, French asserts claims of: (1) securities fraud, in violation of Rule 10b-5 of the Securities Exchange Act; (2) breach of fiduciary duty; (3) fraud; (4) unjust enrichment; (5) conspiracy; and (6) punitive damages. Defendants' Motion for Summary Judgment focuses on French's failure to prove that Barry Sellers made any material misrepresentations or omissions—an essential element of her first three claims. In addition, with respect to her unjust enrichment claim, Defendants argue that Georgia law does not permit such a claim where, as here, a contract governs the relationship. Finally, Defendants argue that French's conspiracy and punitive damages claims fail because her underlying tort claims cannot survive summary judgment. The Court will address each of French's claims below.

**1.**     **Rule 10b-5 Claim**

Rule 10b-5 prohibits "the making of any untrue statement or omission of material fact that would render statements misleading in connection with the purchase or sale of any security." In re Infocure Sec. Litig., 210 F. Supp. 2d 1331, 1348 (N.D. Ga. 2002); 17 C.F. R. § 240.10b-5 (West 2007). To succeed on a securities-fraud claim under Rule 10b-5, a plaintiff must prove that the defendant (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4)

7

upon which the plaintiff relied; (5) that proximately caused her injury. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1999). In their summary judgment motion, Defendants do not discuss the elements of scienter, reliance, or causation. Rather, the focus of their motion—and, therefore, the focus of this Order—is on whether Barry Sellers made any material misrepresentations or omissions to French.

French alleges that Barry Sellers violated Rule 10b-5 by misrepresenting the fair market value of her unit. Sellers contends that he did not misrepresent the value of French's unit because he never suggested that the $15,000 his wife, Crockett Sellers, offered to pay for it reflected its fair market value. Indeed, the Assignment specifically states that: "the purchase price ... neither reflects nor is indicative of any past, present or future fair market value." (Assignment ¶ 6).

Certainly, this language does not help French. However, it also does not cure Barry Sellers's failure to disclose the fact that, in light of the offers of $10 to $14 million he had received for WKA, French's unit may have been more valuable. A reasonable jury could find that, in light of Ronald French's telephone conversation with Barry Sellers, Sellers misled the Frenches into believing that there was no market for the unit, and that $15,000 represented a fair price. Although French had access to information about her unit's book value (her 2001 K-1 tax form, prepared by WKA's accountants, stated the unit's book value was $29,500), she had no access to information concerning the $10 and $14 million offers Barry Sellers had received. A jury is therefore entitled to consider whether Sellers's statements misled French into believing that there was no market for her unit, and that $15,000 represented a fair price.

French also alleges that Barry Sellers violated Rule 10b-5 by failing to disclose certain

8

information to her when she contacted him about selling her interest in WKA. "A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose those facts." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001). Defendants do not dispute that Barry Sellers had such a duty. Indeed, "closed corporations that purchase their own stock have a special obligation to disclose to sellers all material information." Id.; Gerrard v. A.J. Gerrard & Co., 285 F. Supp. 2d 1331, 1344 n.17 (S.D. Ga. 2003). Instead, Barry Sellers argues that the information that he omitted to disclose was not material.

The determination of materiality is a mixed question of law and fact. Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). To satisfy the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 110 (2d Cir. 2005). The "total mix" of information includes "all information reasonably available to the shareholders, including data sent to shareholders by a company." Starr, 412 F.3d at 110 (2d Cir. 2005) (internal quotation marks omitted). "Materiality is a question best left to the trier of fact," and "[s]ummary judgment may not be granted on the ground that alleged omissions are immaterial unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Gerrard, 285 F. Supp. 2d at 1352 (materiality is a question of fact); Castellano, 257 F.3d at 180 (quoting Goldman, 754 F.2d at 1067) (internal quotation marks omitted).

In her Response brief, French enumerates twenty-four "material" facts, which Barry

9

Sellers allegedly failed to disclose to her. (Pl's Resp. Br. 27-29). The facts listed relate to Barry Sellers's engagement of EquiCo, his plans to sell WKA, his valuation of WKA at $20 million, his receipt of offers of between $10 million and $14 million for WKA, and his plans to expand WKA by constructing a third milling facility. French alleges that, at the time she sold her unit, she believed WKA to be a waning company with limited prospects for future growth, based on WKA's infrequent dividend distributions and Barry Sellers's tepid forecasts in his management update letters. French further avers that, had she known of Sellers's plans for WKA, she never would have sold her unit for $15,000.

Barry Sellers counters that he provided adequate disclosure of his future plans for WKA by including the following language in the Assignment: "Assignor understands the General Partner has recently engaged an investment banker to examine the feasibility of partnership sale, expansion, or acquisition." (Assignment ¶ 6). Sellers contends that he was under no obligation to provide more specific information about WKA's possible sale or expansion because those events were merely speculative.

"When contingent or speculative events are at issue, the materiality of those events depends on 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Castellano, 257 F.3d at 180 (quoting Basic, 485 U.S. at 238). It is clear, therefore, that "some facts are deemed material even though they refer to a prospective, and therefore, contingent event provided there appears to be a reasonable likelihood of its future occurrence." SEC v. Mize, 615 F.2d 1046, 1051 (5th Cir. 1980).[2] The probability of an event's occurrence may be measured by

---

[2] Fifth Circuit cases decided prior to October 1, 1981 are binding on the Eleventh Circuit under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

"the indicia of interest in the transaction at the highest corporate levels." Basic, 485 U.S. at 239. Events such as "board resolutions, instructions to investment bankers, and actual negotiations . . . may serve as indicia of interest." Id. However, the "fact that a transaction occurs cannot be determinative." Gerrard, 285 F. Supp. 2d at 1349-50. The magnitude of the transaction to the company may be measured by "the size of the two corporate entities and of the potential premiums over market value." Basic, 485 U.S. at 239.

Applying the test for materiality established by the Supreme Court in Basic and recited above, the potential significance of WKA's sale is considered in light of the likelihood that it would occur. For purposes of this analysis, the relevant date is the date that French decided to sell her interest in WKA—November 13, 2002. See Castellano, 257 F.3d at 181 ("materiality must be analyzed as of [the date] Castellano resold his shares to Y & R."). As of that date, Barry Sellers was in the preliminary stages of effecting a sale of WKA. He had received various indications of interest, and had invited at least one prospective buyer to tour WKA's facilities, but he had not yet begun negotiating the sale price or the terms of sale.

Even though the sale of WKA was in its preliminary stages as of November 2002, this does not mean that information about the sale was immaterial as a matter of law. Basic teaches that materiality must be determined by reference to the magnitude and probability of the transaction. Here, Barry Sellers's efforts to sell WKA were of tremendous significance in the company's history, since he had never before considered the sale of his business, nor gone to such lengths to effect one. See Castellano, 257 F.3d at 181-82 (citing SEC v. Gasper, Fed. Sec. L. Rep. ¶ 92,004, 1985 WL 521, at *15 (S.D.N.Y. 1985) (concluding that "the mere fact that [merger] meetings were taking place was alone material information" when the "founder of the

11

company had never before considered selling his shares."). In this context, Sellers's actions signaled his willingness to sell the company, and could suggest to a reasonable investor the increased likelihood that major changes were about to take place in a company that had grown only incrementally over the past twenty years. Considering WKA's small size, and the per-unit premium that even a $10 million dollar sale would generate, a jury could find that information about the sale was "material" under the standard set out in Basic. Cf. Castellano, 257 F.3d at 182 (merger negotiations, which failed prior to stock sale, were material when they represented the first time the defendant close corporation had ever considered transferring equity to an outsider; the negotiations corroborated the company's ongoing intention to merge or restructure); see also Gerrard, 285 F. Supp. 2d at 1350-52 (finding fact question as to probability of sale of a division of a company when the company had not even received indications of interest at the time the plaintiffs sold their shares).

Barry Sellers argues that his statement in the Assignment that he had retained an investment banker to examine the potential for WKA's sale, expansion, or acquisition, satisfies his obligation to disclose all material information as a matter of law. The Court disagrees. By November 2002, Sellers had done much more than merely retain EquiCo to explore the possibility of a sale. He had received indications of interest offering between $10 and $14 million for the company, met with interested buyers, and allowed at least one potential buyer to tour WKA's facilities. Based on this conduct, a reasonable trier of fact could conclude that Sellers was actively seeking to sell WKA in November 2002, and that the Assignment's "disclaimer" did not adequately convey the degree of Sellers's commitment to effecting a sale.

Because the Court finds a jury question as to the sufficiency of Sellers's disclosure in the Assignment, the Court need not consider the effect of French's failure to thoroughly read the Assignment. Even if French is held to the Assignment's contents, a jury still may find that those contents were insufficient to notify French of information that "a reasonable investor would consider . . . important in his decision to invest." Basic, 485 U.S. at 231. Accordingly, summary judgment is **DENIED** as to French's Rule 10b-5 claim.

2. **Breach of Fiduciary Duty & Fraud Claims**

Defendants seek summary judgment on French's breach of fiduciary duty and fraud claims based on the absence of a material misstatement or omission—an essential element of each. (Defs' Mot. Summ. J. 24). Having concluded that there is a genuine issue of material fact as to whether Barry Sellers made material misrepresentations or omissions to French, the Court cannot grant summary judgment to Defendants on this ground. Because Defendants have presented no alternative basis on which they may be entitled to summary judgment with respect to these claims, their motion is **DENIED**.

4. **Unjust Enrichment**

Defendants next argue that French's unjust enrichment claim fails as a matter of law because Georgia law does not permit such a claim where a contract governs the relationship. In Georgia, unjust enrichment is a cause of action that applies "when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." Cochran v. Ogletree, 536 S.E.2d 194, 196 (Ga. Ct. App. 2000). Thus, "[a]n unjust enrichment theory does not lie where there is an express contract." Cox v. Athens Reg'l Med. Ctr., 631 S.E.2d 792, 798 (Ga. Ct. App. 2006). Here, the Assignment constitutes an

express contract. Therefore, French's unjust enrichment claim fails as a matter of law and Defendants' motion for summary judgment is **GRANTED** as to this claim.

   5.     **Conspiracy & Punitive Damages Claims**

Finally, Defendants seek summary judgment on French's conspiracy and punitive damages claims, arguing that because French's underlying tort claims fail as a matter of law, these derivative claims must fail as well. Having concluded that there is a genuine issue of material fact precluding summary judgment on French's underlying tort claims, the Court cannot grant summary judgment to Defendants on this ground. However, the Court expresses no opinion as to whether Defendants would have been entitled to summary judgment on French's conspiracy and punitive damages claims on other grounds not asserted in their motion. Accordingly, because Defendants have provided no alternative grounds on which they may be entitled to summary judgment with respect to these claims, their motion is **DENIED** as to these claims.

## *CONCLUSION*

For the reasons discussed above, Defendants' Motion for Summary Judgment [Doc. 34] is **GRANTED in part and DENIED in part**. Defendants' motion is **GRANTED** with respect to French's unjust enrichment claim, but **DENIED** with respect to her remaining claims.

   **SO ORDERED.**  This 21st day of March, 2007.

                          S/ C. Ashley Royal
                          C. ASHLEY ROYAL
                          UNITED STATES DISTRICT JUDGE

AEG/jab